*Facility Gateway Corp. v. Sovernet, Inc.*, No. 273-3-17 Cncv (Mello, J., Oct. 31, 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| Facility Gateway Corporation,<br> Plaintiff<br><br> v.<br><br>Sovernet, Inc., ATN International, Inc.,<br>and OHCP Northeast Fiber Buyer, Inc.,<br> Defendants | Docket No. 273-3-17 Cncv |

RULING ON PLAINTIFF'S MOTION FOR AN ATTACHMENT ON BUSINESS ASSETS

In this civil action, Plaintiff Facility Gateway Corporation seeks to recover from defendants the sum of $2,397,506.30, which Plaintiff claims to be owed for services it provided to Defendant Sovernet, Inc. pursuant to a contact to design and build Sovernet's datacenter in Williston, Vermont. Presently before the court is Plaintiff's motion for a non-possessory writ of attachment on Sovernet's business equipment at the datacenter. Defendants oppose the motion. Plaintiff is represented by Erin Miller Heins, Esq., and Defendants are represented by Christopher D. Roy, Esq. and Steven Cowley, Esq.

The court held evidentiary hearings on Plaintiff's motion on May 15, June 28 and July 26, 2017.[1] Based upon the credible evidence, the court makes the following findings, conclusions and orders.

---

[1] At the conclusion of the hearings, the court orally enjoined Sovernet from transferring or encumbering the business equipment that is the subject of Plaintiff's motion, until further order of the court.

Facts

Plaintiff is a Wisconsin corporation engaged in the business of providing facility design and construction services throughout the United States. Defendant Sovernet is a Vermont corporation that provides internet and telecommunication services for residential and business customers throughout Northern New England.

On November 20, 2014, Plaintiff and Sovernet entered into a contract under which Plaintiff agreed to design and build a datacenter for Sovernet at Pioneer Drive in Williston, Vermont for a fixed price of $3,979,900 plus a 2.5% "contingency" (Exhibit 1, Articles 1-4). It was understood that the datacenter was intended to house not only Sovernet's data equipment but also space that Sovernet could rent to its tenants. The contract did not specify a date by which the project was to be completed but left that "[t]o be mutually determined later" (Id., § 3.3). Under the contract, neither party could unilaterally modify the scope of the work to be performed or the price to be paid for the project, nor could either party unilaterally impose deadlines for the completion of the work; any such changes had to be in writing signed by both parties (Id., § 1.3).

On June 22, 2015, the parties agreed to and signed a change order, in which the parties agreed to amend the scope of the work in various ways and to increase the fixed price of the project to $5,546,369 (Exhibit 2, or "Change Order 1).

The contract required Sovernet to make "progress payments" to the Plaintiff "based upon [Plaintiff's] achieving project milestones" (Id., § 5.2.1). The "milestones" were listed in the contract as follows: "20% upon execution, 20% upon completion of engineering and permitting, 25% upon delivery to the site of [Plaintiff's] provided equipment; 20% upon

substantial completion of all major trades, and 15% upon full project completion" (Id.). As each milestone was met, Plaintiff could submit a payment application to Sovernet indicating "the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment" (Id.). Under the contract, Sovernet was required to acknowledge receipt of each application for payment within seven days and to specify any "reasons for withholding payment in whole or in part" (Id., § A.9.4.1). If Sovernet unjustifiably failed to timely pay an invoice, Plaintiff had the right, upon seven days' notice, to stop work until the payment was made (Id., § A.9.7.1). In addition, overdue payments were to bear interest from the date payment was due at the rate of 1.5% per month (Id., § 7.7.2).

Disputes arose between the parties as the project progressed. For example, at various times during the course of the project, the Plaintiff asked Sovernet to make payments which were not yet due under the contract but which Plaintiff needed in order to pay its contractors. On one or more occasions, Plaintiff indicated that it would have to stop work if Sovernet did not make the requested advance payments. In response to these requests, Sovernet made advance payments to the Plaintiff in order to keep the project moving forward, even though it was not required to do so under the contract. Consequently, between the time the project commenced, and the time when the major trades substantially completed their work, Sovernet made 17 payments to the Plaintiff, instead of the four called for in Section 5.2.1 of the contract (see Exhibit 9 for a list of all the payments Sovernet made to the Plaintiff).

In addition, at various points during the project, the Plaintiff claimed that, at Sovernet's request, it had performed $1,683,653 worth of work, over and above what had

been agreed to in the contract and in Change Order 1. Plaintiff submitted a series of change orders to Sovernet, listing the alleged additional work and costs (Exhibits 3A-G and 17, the "unsigned change orders"). Sovernet received the proposed change orders but refused to sign them because, according to Sovernet, all of the work listed in the unsigned change orders had been included within the scope of the original contract and Change Order 1, and because it had never agreed to increase the contract price by an additional $1,683,653.

Another dispute related to a claim by Sovernet that the Plaintiff had not complied with all applicable design specifications in its construction of the datacenter and, therefore, that Plaintiff was not entitled to any further payments from Sovernet under the contract. In addition, Sovernet expressed concerns over the amount of time it was taking the Plaintiff to complete construction of the project. This concern became heightened in March 2016, when Sovernet's largest tenant announced that it would need to occupy the new space by the end of July or find another location to rent from.

In an effort to resolve their disputes, Sovernet and the Plaintiff signed a written agreement on April 27, 2016, in which they made changes to the scope of the work and increased the fixed price of the project by $88,500 to a new total of $5,634,869 (Exhibit 4, or "Change Order 2," ¶ 4). In paragraph 7 of this change order, Sovernet also agreed to pay the Plaintiff, following substantial completion, another $112,500 to reflect "the full satisfaction of the 'contingency' on the Stipulated Sum as described in Section 4.2.5 of the [original contract]." In paragraph 8, Plaintiff agreed "that it will complete all Work to the Specifications and reach Substantial Completion of the project, including recommissioning, no later than June 15, 2016." In paragraph 10, Plaintiff agreed that "upon Substantial Completion" Sovernet could "retain $100,000 (the 'Holdback Amount') of the Stipulated

4

Sum until the first anniversary of Substantial Completion," which Sovernet could use as a "set off" for any warranty claims that arose during the one-year warranty period, or for any claims that "may be brought against [Sovernet] by any contractor or subcontractor hired by [the Plaintiff] in connection with the Datacenter." Lastly, in paragraph 13 it was stipulated that, if either party elected to file a lawsuit "to enforce the terms of the Agreement [i.e., the original contact as amended by Change Order 1] or hold the other party in breach thereof, then upon the filing of such claim in any legal proceeding this Change Order shall be declared null and void and the parties shall retain only those rights and obligations as set forth in the Agreement."

Plaintiff contends that it met the substantial completion deadline of June 15, 2016, as set forth in Change Order 2, because all the major trades had finished their work, and Sovernet had received a certificate of occupancy for the project, by then. The credible evidence does not support the Plaintiff's contention, however.

The contract defines "substantial completion" to mean "the state in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Design-Build Documents so that [Sovernet] can occupy or use the Work or a portion thereof for its intended use" (Exhibit 1, § A.9.8.1). If the datacenter had been ready for occupancy and use as of June 15, 2016, as claimed by the Plaintiff, then Sovernet's largest tenant would have moved in by the end of July. However, neither Sovernet nor its tenant was able to begin using the datacenter until January of 2017. The principal reason for the delay is because it was not until the end of December 2016 that the Plaintiff and its major-trade subcontractors were finally able to get the components of the

datacenter to pass all the commissioning tests called for in the project's plans and specifications.

The credible evidence supports a finding that substantial completion was not achieved until December 29, 2016. Indeed, on February 22, 2017, the parties agreed upon and signed a "Certificate of Substantial Completion" stating: "The date of Substantial Completion of the Project or portion thereof designated above is hereby established as December 29, 2016 which is also the date of commencement of applicable warranties required by the Contract Documents" (Exhibit 6).

As noted earlier, Plaintiff was entitled under the contract to be paid 85% of the contract price and contingency upon reaching substantial completion (Exhibit 1, § 5.2.1). Therefore, as of December 29, 2016, the Plaintiff was entitled to have received $4,885,263.65 from Sovernet.[2] As of that date, Sovernet had paid the Plaintiff $5,020,016 (Exhibit 9). Hence, by the time Plaintiff achieved the substantial completion milestone, it has already received from Sovernet nearly $135,000 more in payments than was called for under the contract, as amended by Change Order 2.

Upon reaching the final "full project completion" milestone (Exhibit 1, § 5.2.1), the Plaintiff would be entitled under Change Order 2 to an additional $627,353 in payments from Sovernet.[3] In order to reach that point, however, the Plaintiff had to complete all punch list items and provide to Sovernet the documents referred to in Section A.9.10.2 of the contract.

---

[2] The contract price of $5,634,869 plus the contingency of $112,000, as set forth in Change Order 2, equals $5,747,369, 85% of which is $ 4,885,263.65.

[3] The $5,747,369 full contract price with contingencies, minus the $5,020,016 paid to date, minus the $100,000 warranty holdback, equals $627,353.

On March 15, 2017, Plaintiff sent an email to Sovernet stating "[w]e have reached final completion of your punch list" (Exhibit 19). If Sovernet responded to this email, its response was not offered into evidence at the hearings on Plaintiff's attachment motion. Sovernet did present testimony as to various issues that it claims must still be completed before the Project can be deemed finally completed, including testing and commissioning issues with the UPS system, issues with the fire suppression system, humidity problems, and leaks, among other things. However, Sovernet offered no documentation of these matters at the hearings. The evidence supports Plaintiff's claim that it completed all the items on the punch list.

Sovernet claims that the Plaintiff still has not provided it with certain documentation required by the contract. Under the contract, Plaintiff was required to provide Sovernet with a "[c]omprehensive training program for normal operation of equipment and manual operation of equipment during emergency operation" (Exhibit 1, Addendum B, Table 12, "Facility Training Programs"). Although Plaintiff provided Sovernet with a manual for each individual piece of equipment in the datacenter, Sovernet claims that Plaintiff failed to provide the comprehensive training materials needed for operation of all the equipment as an integrated whole. Sovernet further claims that it obtained an estimate from a third party to provide it with the comprehensive manuals at a cost of $100,000 but chose instead to create the manuals in house. The evidence suggests that, if any work still remains to be done by the Plaintiff under the contract, the cost to perform it will be significantly less than the $627,353 that would still be due under Charge Order 2.

On October 14, 2016, before achieving substantial completion, the Plaintiff sent an "Application for Payment" to Sovernet seeking a final payment of all remaining amounts

7

owed under the contract in the amount of $702,352.96 (Exhibit 5).[4]  Sovernet did not

acknowledge or respond to the application, as required by Section A.9.4.1 of the contract,

presumably because Sovernet took the position that the Plaintiff had breached the contract,

as amended by Change Order 2, by failing to achieve substantial completion by June 15,

2016, and by failing to provide comprehensive training manuals to Sovernet.

Plaintiff resubmitted its application for final payment to Sovernet in January of

2017, after substantial completion had been achieved.   Sovernet acknowledged receipt of

the application but did not indicate a willingness to pay any further sums to the Plaintiff,

absent a reduction for the damages Sovernet claims it had sustained due to Plaintiff's

alleged breaches.

On March 21, 2017, the Plaintiff filed this lawsuit seeking to recover from Sovernet

$1,683,653 pursuant to the unsigned change orders plus $713,853.30 under the base

contract.  Then on April 6, 2017, Plaintiff sent Sovernet a letter stating that, due to

Sovernet's failure to pay the remaining amounts owed for the completed work on the

datacenter, Plaintiff had stopped work on the project pursuant to Section A.9.7.1 of the

contract (Exhibit 12).

By virtue of the Plaintiff's election to file suit against Sovernet, Change Order 2 is, by

its express terms, now "null and void."  This has the effect of precluding Sovernet from now

claiming that the Plaintiff breached the contract by failing to achieve substantial

completion by June 15, 2016, but it also has the effect of now reducing the amount that

Plaintiff can claim to still be owed under the base contract by $201,000 (i.e., by Change

---

[4] The difference between Plaintiff's figure and the $627,353 referred to above is that
Plaintiff's figure fails to reflect a $75,000 payment that Sovernet made to the Plaintiff on
July 28, 2016 (see Exhibit 9).

8

Order 2's $88,500 increase in the fixed price of the contract, plus the $112,500 "contingency" agreed to in Change Order 2).[5] Hence, the most that the Plaintiff can now claim to be owed under the base contract is $426,353 (i.e., $627,353 minus $201,000), not counting the unsigned change orders or interest.

Plaintiff still has not provided to Sovernet the documents set forth in Section A.9.10.2 of the contract. That section states:

> Neither final payment nor any remaining retained percentage will become due until the [Plaintiff] submits to [Sovernet] (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which [Sovernet] or [Sovernet's] property might be responsible or encumbered (less amounts withheld by [Sovernet] have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Design-Build Documents to remain in force after final payment is currently in effect and will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to [Sovernet], (3) a written statement that the [Plaintiff] knows of no substantial reason that the insurance will not be renewable to cover the period required by the Design-Build Documents, (4) consent of surety, if any, to final payment, and (5) if required by [Sovernet], other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Design-Build Contract, to the extent and in such form as may be designated by [Sovernet]. If a Contractor refuses to furnish a release or waiver required by [Sovernet], the [Plaintiff] may furnish a bond satisfactory to [Sovernet] to indemnify [Sovernet] against such lien. If such lien remains unsatisfied after payments are made, the [Plaintiff] shall refund to [Sovernet] all money that [Sovernet] may be liable to pay in connection with the discharge of such lien, including all costs and reasonable attorneys' fees.

Plaintiff has not offered a credible explanation for why it has not provided these documents to Sovernet.

---

[5] An additional $100,000 (i.e., the 'warranty holdback") will become due on December 29, 2017, unless Sovernet has been, or will have been required to make payments from the holdback for items covered by the warranty.

Discussion

In a civil action for damages, the real and personal property of a defendant "may ... be attached and held to satisfy any judgment for damages and costs which the plaintiff may recover." V.R.C.P. 4.1(a). To obtain an attachment, the moving plaintiff must establish to the court's satisfaction "that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment, over and above any liability insurance, bond, or other security shown by the defendant to be available to satisfy the judgment." V.R.C.P. 4.1(b)(2).

As noted earlier, the Plaintiff seeks to recover $2,397,506.30 in damages from Sovernet, consisting of $1,683,653 alleged due pursuant to the unsigned change orders, plus $713,853.30 allegedly due under the base contract as amended by Change Order 1, not counting interest, penalties and costs. Plaintiff claims that Sovernet is liable for these amounts under theories of breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of Vermont's Prompt Pay Act. Sovernet denies the Plaintiff's claims and asserts that the Plaintiff is liable to it for breach of contract.

Plaintiff's Breach of Contract Claim

Where a contract is unambiguous, the court must "interpret the contract according to its terms and the parties' intent as expressed in the contract language." New England Partnership, Inc. v. Rutland City School District, 173 Vt. 69, 79 (2001); see also KPC Corp. v. Book Press, Inc., 161 Vt. 145, 150 (1993) (If the terms of the contract are plain and unambiguous, "they will be given effect and enforced in accordance with their language.").

The Plaintiff is not reasonably likely to recover judgment against Sovernet on a breach of contract theory for the $1,683,653 allegedly due pursuant to the unsigned change

orders. Under the contract, neither party could unilaterally modify the scope of the work to be performed or the price to be paid for the project, nor could either party unilaterally impose deadlines for the completion of the work; any such changes had to be in writing signed by both parties (Exhibit 1, §§ 1.3 and A.7.2.1). It is undisputed that Sovernet did not sign any of the Plaintiff's proposed change orders, other than Change Order 1 and Change Order 2. Because the other proposed change orders totaling $1,683,653 of allegedly additional work were never signed by Sovernet, the Plaintiff cannot recover under them on a breach of contract theory as a matter of law.

Moreover, at the hearings on Plaintiff's motion for an attachment, Plaintiff did not present any witnesses with personal knowledge regarding the content of the unsigned change orders. Thus, no one with personal knowledge testified that the work reflected in the unsigned change orders had been approved by Sovernet, or had been actually performed by the Plaintiff, or was worth the amounts claimed in the proposed change orders, or was work over and above that which the Plaintiff was already required to perform pursuant to the contract documents. Plaintiff had the burden of proof on these issues but did not meet it.

The Plaintiff is also not reasonably likely to recover judgment against Sovernet on a breach of contract theory for the $713,853.30 allegedly due under the base contract. First of all, for the reasons set forth above, the most that the Plaintiff could recover from Sovernet as a final payment under the base contract is $426,353. Moreover, the contract expressly provides that "[n]either final payment nor any remaining retained percentage will become due until the [Plaintiff] submits to [Sovernet]" the documents listed in Section A.9.10.2 of the contract. Under the plain language of the contract, Sovernet's liability to the

11

Plaintiff for the final payment is contingent upon the Plaintiff's complying with Section A.9.10.2. It is undisputed that the Plaintiff has not yet provided any of those documents to Sovernet. Therefore, the Plaintiff is not entitled to its final payment, as a matter of law.

Plaintiff argues that it could not comply with Section A.9.10.2 because Sovernet never explained why it was rejecting Plaintiff's application for final payment as required by Section A.9.4.1 and never accepted the work as required by Section A.9.10.1. Plaintiff's argument is unpersuasive. Plaintiff did not need Sovernet to accept the work, or to explain why it was rejecting Plaintiff's application for payment, in order for the Plaintiff to provide Sovernet with releases, liens waivers and/or affidavits establishing that Plaintiff has paid for all labor, materials, equipment and supplies related to the datacenter project. Nor this this a mere technical requirement, especially given Plaintiff's history of repeatedly asking Sovernet for advance payments in order to pay its contractors and its threats to stop work if its requests were not complied with.

<u>Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim</u>

Implied in every contract is the implied promise "not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." <u>Carmichael v. Adirondack Bottled Gas Corp.</u>, 161 Vt. 200, 208 (1993). "The implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" <u>Id.</u> (quoting from Restatement (Second) of Contracts § 205 comment a (1981)).

Plaintiff claims that Sovernet breached the implied covenant by refusing to acknowledge substantial completion for two months after admitting that substantial completion had occurred, failing to sign off on any final punch list for the project knowing

12

that Plaintiff could not get paid without Sovernet's approval, demanding additional work but refusing to sign change orders for the work, and withholding final payment in an amount that is much more than the value of any work remaining to be done, among other things. These are all breach of contract claims recast as breaches of the covenant of good faith and fair dealing. As such, they cannot support an independent cause of action.

This is because the Vermont Supreme Court has made clear that it "will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct.*" Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 54, n.5, 179 Vt. 167 (emphasis in original); Harsch Properties, Inc. v. Nicholas, 2007 VT 70, ¶ 14, 182 Vt. 196 ("A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different conduct."); Ferrisburgh Realty Inv'rs v. Schumacher, 2010 VT 6, ¶ 26, 187 Vt. 309 (affirming trial court's elimination of jury award to plaintiff on breach of covenant of good faith claim where plaintiff "identifie[d] no conduct distinct from that supporting the breach of contract claim" but rather "focuse[d] solely on [defendant's] motivation for the breach"). Therefore, Plaintiff is not reasonably likely to prevail on its breach of the implied covenant claim.

Plaintiff's Unjust Enrichment Claim

"Under the doctrine of unjust enrichment, a party who receives a benefit must return the [benefit] if retention would be inequitable…. Unjust enrichment applies if 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." Gallipo v. City of Rutland, 2005 VT 83, ¶ 41, 178 Vt. 244 (citations omitted). The Vermont Supreme Court has described the elements of

13

an unjust enrichment claim as follows: "Unjust enrichment is present only if: '(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value.'" Kellogg v. Shushereba, 2013 VT 76, ¶ 31, 194 Vt. 446. However, where the parties have a contractual relationship, the doctrine of unjust enrichment cannot be used to circumvent the contract. DJ Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 245 (2001) ("Failure to receive the contract price under the circumstances of this case is not enough to prove that Baraw has been unjustly enriched. Moreover, it can hardly be equitable to impose a contract on the parties that completely undermines the contractual relationships that the parties themselves have created.").

If the Plaintiff had presented persuasive evidence that Sovernet's representatives had asked the Plaintiff to perform up to $1,683,653 worth of work on the datacenter, knowing that this work was over and above what the parties had contracted for, and then refused to sign change orders reflecting that work, the court would agree that such evidence would support an unjust enrichment claim, notwithstanding the contract's clear requirement that change orders be written and signed by the parties. However, the Plaintiff did not come forward with such evidence.

Moreover, with respect to Plaintiff's claim to a final payment of $426,353 under the base contract, it is not inequitable for Sovernet to insist upon receipt of the documents set forth in Section A.9.10.2 of the contract, before having to make the final payment. Therefore, Plaintiff is not reasonably likely to prevail on its unjust enrichment claim.

14

Plaintiff's Prompt Pay Act Claim

Vermont's Prompt Pay Act provides a remedy for contractors and subcontractors who have not been paid for their work. Birchwood Land Co. v. Ormond Bushey & Sons, Inc., 2013 VT 60, ¶ 21, 194 Vt. 478 ("The purpose of the prompt payment act is to provide protection against nonpayment to contractors and subcontractors." (citation omitted)). The statute obligates owners to pay contractors "strictly in accordance with the terms of the construction contract." 9 V.S.A. § 4002(a). If payment is delayed, the owner is required to pay interest at the statutory rate. Id. § 4002(d). The owner who "unreasonably withholds acceptance of the work" may also be required to pay interest and attorney's fees. Id. § 4005(d). However, an owner may withhold payment from a contractor "in an amount equaling the value of any good faith claims against an invoicing contractor or subcontractor, including claims arising from unsatisfactory job progress, defective construction, disputed work, or third-party claims." Id. § 4007(a). If the contractor sues the owner for the amount withheld, the Act provides that "the substantially prevailing party" may recover his, her or its reasonable attorney's fees. Id. § 4007(b) and (c).

Plaintiff claims that Sovernet violated the Act by failing to respond, as required by Section 9.4.1 of the contract, to Plaintiff's "Application for Payment," which Plaintiff sent to Sovernet in October 2016, before achieving substantial completion, and again in January of 2017, after achieving substantial completion. Plaintiff further claims that Sovernet violated the Act by failing to sign off on the punch list, as required by Sections A.9.8.1 and A.9.8.2 of the contract, after receiving Plaintiff's email of March 15, 2017, stating "[w]e have reached final completion of your punch list," and that Sovernet did this knowing that the Plaintiff could not be paid until Sovernet had signed off on the punch list. In addition, Plaintiff

claims that in March of 2017, Sovernet's representatives told the Plaintiff that Sovernet was not going to pay the Plaintiff anything further, that Sovernet was in the process of being sold, and that Sovernet could "wait out" the Plaintiff.

Sovernet denies the Plaintiff's contentions and argues that Plaintiff''s Prompt Pay Act claim cannot succeed because there is a good-faith dispute between the parties as to whether any further amounts are owed by Sovernet to the Plaintiff under the contract.

Plaintiff does not argue that Sovernet violated the Prompt Pay Act by failing to agree to and sign Plaintiff's $1,683,653 worth of unsigned change orders. Such a claim clearly would not be viable under the Act. As noted earlier, neither party could unilaterally change the scope of the datacenter project or unilaterally increase its fixed price; any such changes had to be in writing and signed by both parties in order to be effective. Moreover, the Plaintiff expressly waived its claims under the unsigned change orders when it agreed to Change Order 2, although the Plaintiff subsequently voided that waiver by initiating this lawsuit.

Plaintiff also could not argue that Sovernet violated the Prompt Pay Act by failing to make payments required by the contract up to the time of substantial completion. As noted earlier, by the time that the Plaintiff achieved substantial completion on December 29, 2016, Sovernet had already paid the Plaintiff amounts well in excess of the 85% called for by the contract.

Plaintiff does have a good argument that Sovernet wrongfully refused to sign off on the punch list, knowing that the Plaintiff could not be paid the remaining $426,353 that is still due under the base contract without Sovernet's sign off. Sovernet argues that it has a good-faith basis for refusing to sign off on the punch list because work still remains to be

16

done by the Plaintiff under the contract. However, the evidence supports Plaintiff's contention that, to the extent that any work still remains to be done, the cost to perform any it will be significantly less than the $426,353 that is still owed.

Nevertheless, it is undisputed that the Plaintiff still has not provided to Sovernet the documents called for in Section A.9.10.2 of the contract. Because Sovernet's liability to the Plaintiff for the $426,353 final payment is contingent upon Plaintiff's complying with that requirement, Sovernet has a good-faith basis for continuing to withhold the payment until the Plaintiff complies with it. Therefore, the Plaintiff cannot prevail on its Prompt Pay Act claim unless and until it complies with Section A.9.10.2 of the contract.

Sovernet's Defenses

Based upon the forgoing findings and discussion, the court concludes that the Plaintiff could be entitled to an attachment on Sovernet's business equipment, in the amount of $426,353 plus interest and anticipated attorney's fees, if the Plaintiff were to comply with Section A.10.9.2 of the contract, and if Sovernet were nevertheless to continue to refuse to make final payment to the Plaintiff under the contract. Anticipating that that eventuality might occur, the court must address certain defenses that Sovernet has raised to the Plaintiff's claims.

Sovernet contends that the Plaintiff materially breached the contract by failing to achieve substantial completion by June 15, 2016, and by failing to provide Sovernet with the comprehensive training materials referred to Addendum B, Table 12 of the contract. Sovernet alleges that because of the Plaintiff's delay in achieving substantial completion, Sovernet lost over $400,000 in rental income from its largest tenant, and because of Plaintiff's failure to provide the required comprehensive training materials, the Plaintiff has

17

had to recreate them in house at considerable expense. Lastly, Sovernet argues that, because these breaches are material and have caused Sovernet substantial injury, the Plaintiff is precluded from enforcing any rights under the contract.

It is a general rule of contract law that a party may repudiate a contract if the other party commits a material breach, i.e., a breach that causes the injured party a substantial injury. Brady v. CU York Insurance Co., 2006 WL 5866264 *2 (Vt. Sup. Ct., March 2006) (unpublished entry order) (citing the Restatement (Second)of Contracts § 237 (1981) (condition of party's duty to render performance under exchange of promises is that there be "no uncured material failure by the other party to render any such performance due at an earlier time")). The law recognizes an exception, however, where there has been substantial performance and the breach does not go to the whole contract. Cushman v. Outwater, 121 Vt. 426, 433 (1960) ("Where the innocent party has received partial performance and substantial benefit it would be unjust to allow him to avoid his contractual duties altogether because the performance of the other party is interrupted short of completion by a breach.").

For several reasons, the court rejects Sovernet's contentions. First, although the court has determined that the Plaintiff failed to achieve substantial completion by June 15, 2016, and although that was a material requirement of the contract as amended by Change Order 2, Sovernet cannot rely upon it because Change Order 2 is no longer in effect. Change Order 2 became, by its express terms, "null and void" upon Plaintiff's filing this lawsuit. As noted earlier, the original contract did not specify a date by which the project was to be completed but left that "[t]o be mutually determined later." Because Change Order 1 did not specify a completion date, and because Change Order 2 is no longer in effect, Sovernet

18

cannot claim that the Plaintiff breached the contract by failing to achieve substantial completion by June 15, 2016.

Sovernet also cannot complain that it lost over $400,000 in rental income because of the Plaintiff's delay in achieving substantial completion. This is because Sovernet has explicitly waived any right to seek "loss of use" or "lost income" type damages from the Plaintiff. Section A.4.1.10 of the contract stipulates that the parties "waive [c]laims against each other for consequential damages arising out of or relating to" the contract." The section goes on to say, "This mutual waiver includes … damages incurred by [Sovernet] for rental expenses, [and] for losses of use, income, profit, financing, business and reputation…." Therefore, Sovernet cannot seek to offset its claimed lost rental income against amounts it owes to the Plaintiff under the contract.

Lastly, although the Plaintiff failed to provide Sovernet with the comprehensive training materials called for in Addendum B, Table 12 of the contract, this breach did not go to the essence of the contract. The evidence admitted at the hearings on Plaintiff's motion for an attachment demonstrates that the Plaintiff has substantially performed the work called for in the contract. Therefore, the Plaintiff has not forfeited its right to final payment in the amount of $426,353, so long as Plaintiff delivers to Sovernet the documents called for in Section A.9.10.2 of the contract.

Plaintiff's Attachment In a Related Matter

Finally, on October 5, 2017, Sovernet brought to the court's attention the fact that in April of 2017, the Plaintiff recorded in the Williston Land Records a Notice of Lien asserting "a lien for labor and materials furnished" in connection with the construction of Sovernet's datacenter in Williston. The Plaintiff then commenced a civil action against LNP, Inc., the

owner of the property, to enforce the lien, and Plaintiff obtained an attachment on LPN, Inc.'s real estate in that action, which attachment serves to secure any judgment Plaintiff might obtain in that case.

Sovernet contends that Plaintiff's attachment in the LPN, Inc. should preclude Plaintiff from obtaining any attachment in this case. In addition, Sovernet asks the court to sanction the Plaintiff for failing to disclose its Notice of Lien and suit against LPN, Inc. during the hearings on its motion for an attachment in this case. Plaintiff opposes Sovernet's request.

The court agrees with Sovernet that Plaintiff's attachment in the LPN, Inc. case provides an additional reason to deny Plaintiff's request for an attachment in this case. As noted earlier, a request for an attachment may be denied if the defendant shows "other security ... to be available to satisfy the judgment." V.R.C.P. 4.1(b)(2). The court will not act on Sovernet's request for sanctions, however, in the absence of evidence that Sovernet has complied with the requirements of V.R.C.P. 11(c)(1)(A).

<u>Conclusion</u>

For all the foregoing reasons, Plaintiff's motion for a writ of attachment on Defendant Sovernet's business assets is DENIED.

SO ORDERED this _31st day of October, 2017.

_____
Robert A. Mello, Superior Judge

20